**UNITED STATES of America**

v.

**Joseph TRAVERS, Defendant.**

**No. 96CR477.**

United States District Court,
S.D. Florida.

Feb. 25, 1998.

 

Marvelle McIntyre–Hall, Miami, FL, for U.S.

William D. Matthewman, Miami, FL, for Defendant.

## CORRECTED ORDER GRANTING MOTION TO WITHDRAW AND ORDER THAT DEFENDANT HAS FORFEITED HIS RIGHT TO COUNSEL

UNGARO–BENAGES, District Judge.

This cause is before the Court on William Matthewman, Esq.'s October 7, 1997 Motion To Withdraw As Counsel and Matthewman's January 29, 1988 Renewed Motion To Withdraw As CJA Counsel For Defendant Joseph S. Travers. Matthewman is Defendant Travers' *eighth* counsel to represent him in this case. In conjunction with these motions, the Court must also consider whether, at this juncture, Defendant Travers has forfeited his Sixth Amendment right to court-appointed representation. These important matters can only be fully appreciated in the context of the procedural history of this case and the lengthy, tortuous and complex history of Defendant Travers' dealings with counsel.

## BACKGROUND

### A.  The Indictments

To begin at the beginning, the Defendant was indicted in May, 1996. The original indictment named only the Defendant, contained seven counts of mail fraud and sought forfeiture of all property and proceeds thereof derived from the Defendant's alleged illegal activities. The fraudulent scheme underlying the substantive charges included allegations that the Defendant assumed V.A. and F.H.A. guaranteed mortgages under assumed names or in the names of corporations which he controlled, collected the rents on the encumbered properties, and then failed to remit the income to the mortgagors or otherwise make the mortgage payments, thereby causing the properties to be foreclosed. The indictment also alleged that the Defendant would delay the foreclosure proceedings by various means, including filing for bankruptcies in fictitious names. Concurrent with filing the

indictment, the United States, via an *ex parte* motion, successfully sought entry of a protective order restraining the disposition of funds in certain bank accounts into which the Government suspected that Travers had deposited some of the rents.

On or about September 6, 1996, the United States superseded the indictment. The new indictment named Wendy Fong, Defendant's wife, as his co-defendant and added counts 8 through 40. Counts 8 through 15 alleged bankruptcy fraud with respect to eight separate bankruptcy cases in which the Defendant petitioned for relief under the bankruptcy laws using false identities; Count 16 alleged that the Defendant had committed "equity skimming" in violation of 12 U.S.C. § 1709-2 by "purchasing" some 90 homes each of which was subject to a loan secured by H.U.D., guaranteed by the V.A. or made by the V.A., which loan was in default within one year subsequent to purchase, collecting the rents therefrom and failing to repay the loans; Counts 17–40 alleged money laundering pursuant to 18 U.S.C. § 1956(a)(1)(A)(i) in that the Defendants allegedly deposited and withdrew funds, which were the proceeds of their activities constituting mail fraud, from certain bank accounts with the intent to promote the carrying on of such activities. In addition, the Government expanded the forfeiture count, which was count 41 in the superseding indictment, to include additional specific properties.

On or about January 28, 1997, Defendant Travers, through temporary counsel, moved for the return of approximately $67,000 in cash which had been seized from his residence during execution of a search warrant prior to his arrest. After the Defendant received a favorable ruling from the Magistrate Judge on this motion, the United States

again superseded the indictment. The second superseding indictment, which was filed on March 14, 1997 and remains pending, contains sixteen new money laundering counts (the money laundering counts are now counts 17 through 56), adds count 57 alleging that the Defendants attempted to engage in a monetary transaction in excess of $10,000, which funds were derived from the Defendants' activities constituting mail fraud in violation of 18 U.S.C. § 1957, and expands the forfeiture count to include additional specific properties, including the approximate $67,000 seized from his residence. By "indicting" the $67,000, the United States shifted the burden to the Defendant to demonstrate that the seizure was wrongful. *See, United States v. Bissell*, 866 F.2d 1343 (11th Cir.1989). The Defendant failed to produce such evidence and therefore the Court declined to enter an order requiring that the funds be returned to the Defendant.

## B. The Lawyers

Travers was initially represented in this case by **Sky Smith, Esq.**[1] who entered a temporary appearance on May 9, 1996, at Travers' first appearance and bond hearing.[2] However, on May 15, 1996, the Defendant appeared before the Magistrate Judge, claimed he could not afford to retain counsel of his choice and requested that the Court appoint counsel for him. After determining that the Defendant was eligible for court appointed counsel, the Magistrate Judge appointed the **Federal Public Defender** to represent him. Then, on May 24, 1996, the Defendant again appeared before the Magistrate Judge concerning counsel. The minutes of the hearing reflect that the Defendant "is trying to obtain counsel. Discharge

1. In a *pro se* pleading which Travers filed on December 31, 1997, Travers accused Smith of being incompetent and unfamiliar with the "complex" facts and circumstances of his case. Travers has levied such accusations against all but one of the attorneys who have represented him in this case. As explained below, the undersigned does not share Travers' opinions concerning the attorneys.

2. At the initial bond hearing, the Magistrate Judge denied the United States' request for pre-

trial detention and established Travers' conditions of release as follows: $250,000 corporate surety bond, $250,000 10% bond and a $1 million personal surety bond to be co-signed by Travers' wife, subject to a *Nebbia* requirement. The Defendant did not appeal his bond to the District Court, but the United States appealed the denial of its Motion For Pre–Trial Detention to the District Court. The appeal was unsuccessful, and the bond established by the Magistrate Judge was affirmed.

the AFPD" and that a report date was set for May 29, 1996.

Defendant Travers was brought to hearings before the Magistrate Judge on May 29, June 6, June 10, and June 19, 1996 concerning his progress in retaining counsel and, on each occasion requested additional time to arrange for representation. Meanwhile, on June 3 and 4, 1996, Travers filed his first of numerous *pro se* pleadings reflecting his inability or unwillingness to come to terms with the fact that he is not entitled to *his choice* of counsel, unless he can afford to pay for such representation.[3] In these communications, Travers informed the undersigned that he wished to retain Milton Ferrell, Esq., a prominent Miami attorney, that he could not afford Mr. Ferrell's fee of $75,000 in advance, but that he was sure that if only he were released on bond, he would be able to persuade Mr. Ferrell to lower his fee. Also, on June 18, 1996, the Court issued its first order setting the case for trial during the two week period commencing July 8, 1996.

On July 3, 1996 **Robert Targ, Esq.** and **Daniel Forman, Esq.** entered permanent appearances as counsel of record for Defendant Travers. At about the same time, Targ and Forman successfully moved for a continuance of the trial date, arguing that they needed additional preparation time, and the case was reset to the two week period beginning July 22, 1996. However, on August 22, 1996, after Targ and Forman were unsuccessful in obtaining a reduction in Travers' bond,[4] Travers sent a letter to the Court stating "I am writing the Court directly because my present attorneys Dan Forman and Robert Targ are not providing me with competent assistance of counsel ..." and requesting a hearing "... to determine the facts underlying my ineffective assistance of counsel problem and to compel if necessary, counsel to provide reasonable assistance or the return of retainer ...."

Then, on August 23, 1996, while Targ and Forman remained counsel of record, **Fred Schwartz, Esq.** filed Defendant's Second Motion For Modification of Bond and Satisfaction of *Nebbia* Requirement.[5] Unknown to the Court when this motion was filed, Schwartz also was consulting with Wendy Fong concerning her criminal exposure in the case.[6] In any event, on August 30, 1996, a criminal complaint was filed against Wendy Fong, and Schwartz entered a permanent appearance on her behalf.[7]

Also on August 30, 1996, Targ and Forman moved to withdraw as counsel for Defendant Travers citing the development of a "strained relationship due to irreconcilable differences of opinion concerning the course and direction of the litigation" and alleging that Travers had informed them that he had instructed Schwartz to "take over" the litigation. Travers opposed the motion in several *pro se* filings with the Court, all of which went to confirm that Targ's and Forman's motion to withdraw was well-founded. For example, on September 11, 1996, in a handwritten pleading, Travers complained that Forman and Targ had failed to render adequate and competent legal assistance and had refused to work under Schwartz as "lead counsel," and requested that the Court order them to submit to Schwartz's supervision.

3. *E.g., Thomas v. Wainwright*, 767 F.2d 738, 741 (11th Cir.1985); *Wike v. State*, 698 So.2d 817, 820 (Fla.1997); *see also, Morris v. Slappy*, 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983).

4. Targ and Forman asked the Magistrate Judge to modify Travers' bond conditions to consist of a $500,000 10% bond and a reduced personal surety bond.

5. The United States made the following prescient statement in response to the motion: "This defendant seeks to manipulate the judicial system to cater to his every whim. He has presently had four attorneys of record excluding Mr. Schwartz. It appears that whenever something does not occur as the Defendant wants it to occur, he

releases his attorney. While he is entitled to counsel of his choice, he is not entitled to subject the Court to these dilatory tactics."

6. Schwartz shortly resigned from the Florida Bar in the face of pending charges and withdrew from his representation of Fong.

7. Schwartz's motion to withdraw was granted by the undersigned on April 17, 1997, and thereafter the Magistrate Judge appointed Thomas Almon, Esq. to represent Fong. As of the date of this Order, Almon remains her counsel of record, but the United States has advised the Court that it is in possession of information suggesting that Travers may attempt to sabotage that attorney-client relationship.

On September 16, 1997, Travers filed a letter he had written to Targ and Forman on July 28, 1996, which otherwise would have been privileged,[8] in which he had admonished them that they had failed to provide him with certain items he had requested, such as a copy of the search warrant, a copy of the inventory of items seized from his residence, and copies of pages of the sentencing guidelines and case law, and complained that they had not filed a motion for the appointment of a receiver to collect the rents on the subject properties.

On September 17, 1996, the Magistrate Judge heard argument on Targ's and Forman's motion to withdraw and on September 18, 1996, entered his order granting the motion. In the order, the Magistrate Judge stated that he was allowing them to withdraw "... due to irreconcilable differences of opinion with defendant including his agreements concerning matters relating to the defense of Mr. Travers in this case. Moreover, the Court finds that Mr. Travers has sought assistance of counsel other that Mr. Forman and Mr. Targ for motions filed in this case without consulting with his counsel of record in this case."[9] The order also stated, "Defendant Travers will advise the Court, at a hearing to be conducted on October 2, 1996, concerning his retention of other counsel in the case or any request for court appointed counsel."

Travers appeared before Magistrate Judges several times during the month of October to report on his efforts to retain counsel now that Targ and Forman had been permitted to withdraw, *but* on each occasion requested additional time to find a lawyer. He also continued to complain about Targ and Forman and the fact that their withdrawal had been allowed by the Court. In one *pro se* pleading, dated October 10, 1996, he asserted that Targ and Forman were lying when they earlier stated that they had irreconcilable differences with him, thereby demonstrating that his relationship with them was in fact antagonistic.[10]

On November 8, 1996, Travers appeared before the Magistrate Judge to be arraigned on the first superseding indictment. At that time, presumably because Travers still had no lawyer and because the Magistrate Judge previously had found Travers to be indigent, CJA counsel, Amy Agnoli, Esq., was appointed to represent him. Agnoli immediately sought a sixty day continuance of the trial date pointing to the fact that the discovery in the case was voluminous and that she needed additional time to conduct an investigation. Her motion was granted and the trial continued to January 27, 1997.

Travers never made a serious effort to work with Agnoli. She was his counsel only for approximately two weeks when Travers filed three *pro se* motions, including his Motion For Immediate Removal and Disqualification Of A Court Appointed Counsel in which he stated that Agnoli "... is absolutely not qualified by experience and knowledge to properly represent me for this type of case."[11] On January 2, 1997, Travers filed in

---

8. Travers has filed in the public record many letters which he has written to his various attorneys, notwithstanding that he has been advised that such filings jeopardize the confidentiality of his attorney-client communications and are otherwise not in his best interest.

9. The Magistrate Judge did not then address the amount of the retainer that had been paid to Targ and Forman and whether any portion of the retainer should be returned. Although Travers later complained that the Magistrate Judge's failure to order Targ and Forman to return their retainer prejudiced his ability to retain counsel, he did not appeal or seek reconsideration of that aspect of the Magistrate Judge's order. Moreover, the Court has recently queried Travers concerning the amount of the retainer paid to Targ and Forman, and Travers was unable to state how much they had been paid.

10. Travers also began complaining about Schwartz. For example, on December 11, 1996, Travers filed in the public record a letter he had written to Schwartz complaining that he had retained Schwartz to represent both him and his wife, but that Schwartz is loyal only to his wife, and accusing Schwartz of negligence.

11. All of the CJA attorneys in the Southern District of Florida are highly qualified. The Court limits the size of its CJA panel to assure the highest quality representation. Also, each of the attorneys on the panel is required to apply in writing for CJA panel membership, and to demonstrate to the CJA Panel Selection Committee that he or she has sufficient experience and knowledge of the Federal Rules of Evidence and the Federal Rules of Criminal Procedure and sufficient trial experience to provide legally ade-

the court file a copy of a letter he had written to Agnoli in which he accused Agnoli of being "no assistance of counsel whatsoever," of violating his confidences and of other unspecified unethical conduct. He also complained that she had failed to visit him and had failed to keep him advised of developments in his case. The letter ended with his urging her to withdraw as soon as possible.

On January 22, 1997, the undersigned held a calendar call to address the upcoming trial date, particularly in light of Travers' refusal to cooperate with Agnoli. At the calendar call, which was attended by Ms. Agnoli on Travers' behalf, attorney **William Xanttopolous** unexpectedly appeared and requested permission to make a temporary appearance. Xanttopolous explained that Travers wished to retain him, and that his retainer likely could be paid with the approximately $67,000 seized from Travers' residence which, according to Xanttopolous, was being wrongfully withheld by the United States. Xanttopolous proposed that the trial date be held in abeyance,[12] and that he be permitted to litigate the return of the monies as Travers' counsel on a limited basis with the understanding that he would enter a permanent appearance for Travers only if successful.

Court policy discourages temporary or limited appearances. However, it was clear by this point that Travers likely would not cooperate with Ms. Agnoli and probably would not cooperate with any court appointed counsel. While the undersigned did not wish to sanction Travers' abusive conduct, the Court also was reluctant to force Travers either to proceed *pro se* in the event he could not retain counsel. Accordingly, the Court acquiesced to Xanttopolous' and Travers' request, but only if Ms. Agnoli remained Travers' permanent counsel while Xanttopolous litigated the return of the seized funds.

Xanttopolous filed his Motion For Relief From Seizure of Property on January 28, 1997, and on March 6, 1997, obtained a favorable ruling from the Magistrate Judge. However, on March 13, 1997, the United States successfully sought a stay from the District Court, and then on March 14, 1997, filed a second superseding indictment in which the United States specifically sought forfeiture of the funds. On April 3, 1997, the Magistrate Judge entered his order granting the United States' Motion for Reconsideration and Vacating the March 6, 1996 Order, and on April 17, 1997, the undersigned entered her Order Affirming Order of Magistrate Judge and Denying Motion for Reconsideration. Also on April 17, 1997, Xanttopolous was allowed to withdraw his temporary appearance.

With the unfavorable disposition of his motion to release the funds, Travers recommenced his attacks on Agnoli. For example on May 19, 1997, Travers filed in the public record a letter he had written to Agnoli complaining about her failure to communicate with him, failure to visit him, failure to file pleadings he considered appropriate, failure to cooperate with him and making misrepresentations to the court. On June 12, 1997, in yet another *pro se* pleading, Travers described Agnoli as "grossly incompetent and incapable of even miniscule defense requirements." [13]

Meanwhile the Magistrate Judge held a hearing wherein he urged Agnoli to reach a decision promptly whether she would seek to withdraw from representing Travers due to his lack of cooperation. Ultimately, Agnoli filed her Motion to Withdraw stating *inter alia* that Travers disagreed with her methods of handling issues in the case and that it remained Travers' desire to retain private counsel. The Magistrate Judge also held hearings to query Travers concerning his progress in locating private counsel. At the

---

quate representation. The Panel Selection Committee consists of a District Judge, a Magistrate Judge, the Federal Public Defender and four attorneys in private practice. Appointments from the CJA panel are required to be made on a rotational basis (which is how Agnoli was selected), subject to the discretion of the responsible Magistrate Judge or District Judge.

12. Schwartz appeared for Fong at the calendar call and requested a lengthy trial continuance.

13. On March 17, 1997, the Court had entered its order resetting the trial for the two week period beginning June 9, 1997. However, by the time of the June trial date, Travers was in a hostile, uncooperative posture *vis a vis* Agnoli. Accordingly, the trial date was again continued.

same time, the undersigned began to consider the wisdom of replacing Agnoli and, if replaced, with whom. Among the Court's concerns were how best to balance Travers' Sixth Amendment right to counsel against his chronic inability to maintain an attorney client relationship and whether his abusive conduct toward his lawyers was purposeful and intended to disrupt the judicial process. The undersigned also consulted with the Magistrate Judge concerning Agnoli's motion and who might be both willing to succeed her and acceptable to the Defendant in the event that the Defendant failed to retain his own lawyer.

On June 20, 1997, the Magistrate Judge entered his order allowing Agnoli to withdraw and appointed CJA lawyer, **William Matthewman, Esq.**, to succeed her.[14] In permitting Agnoli's withdrawal, the Magistrate Judge made no findings concerning Agnoli's effectiveness or competence; however, the record reflects that Travers never gave Agnoli an opportunity to exercise independent judgment on his behalf and that therefore no findings could have been made due to Travers' abusive conduct.

Travers needed less than two weeks thereafter to conclude that Matthewman also was unacceptable to him. On July 8, 1997, Travers filed in the public record a letter he had written to Magistrate Judge Bandstra on July 3, 1997. In the letter Travers complained that "... the Court appointed lawyer William Matthewman who initially visited me on July 2, 1997 is not experienced or familiar with the substantial areas of law that are

involved in this case...." He went on to state, *inter alia,* "We are not compatible and there is no reasonable basis to compel me to have him try to represent and defend me." He then proposed that the court appoint another CJA attorney—one of his choosing.

On July 11, 1997, the District Court held a hearing to address the significance, if any, of Travers' most recent communication to Magistrate Judge Bandstra and other pending matters. Travers addressed the Court personally and again insisted that he needed "private counsel" because of the "complexity" of his case.[15] With respect to Matthewman, he stated "... the expertise, the experience is just not there...." Travers also persisted in his position that he should select his CJA counsel. In the end, the undersigned admonished Travers that he would either have to work with Matthewman, he would have to retain counsel, or he would have to represent himself.

At the hearing, the Court also addressed Travers' pending request for authorization to retain a forensic accountant to assist in the preparation of his and his wife's defense. The Court advised Travers that she would not authorize the retention of experts and the expenditure of CJA funds for their services so long as Travers' attorney-client relationship remained unsettled. By the conclusion of the hearing, Travers had assured the Court that he would make every effort to work with Matthewman and, in reliance thereon, the undersigned authorized the retention of the accountant as well as the reimbursement of substantial copying costs.[16]

14. The Magistrate Judge appointed Matthewman after conferring with the undersigned. Matthewman was well known to the Court because he had handled several matters before the undersigned, including most notably the representation of Chedrick Crummie in *United States v. Edward Mack,* Case No. 93–252–Cr. The *Mack* case was the first federal death penalty case tried in any district in Florida since the enactment of 21 U.S.C. § 848(e), was highly complicated both factually and legally, and required five months to try. Crummie was one of three defendants in the *Mack* case against whom the government sought the death penalty. The Court believed, based upon her experience with Matthewman, that Matthewman had the maturity, insight, and legal and interpersonal skills necessary to deal with Travers and gain his confidence, and therefore

suggested his appointment as Travers' counsel to the Magistrate Judge.

15. The undersigned agrees with Matthewman's assessment that Travers' case is not particularly complex and that Matthewman is more than qualified to handle the matter.

16. At or about this time the Court entered its Order Setting Trial Date, setting the case for trial during the two week period commencing January 19, 1998. The long continuance was necessitated by Matthewman's and Almon's involvement in a lengthy RICO trial. As explained below, Travers agreed with Matthewman that the continuance should be sought and agreed to waive speedy trial, but later tried to renege on his waiver. In any event, the case could not proceed

In less than a month, Travers recommenced his attacks on Matthewman. On August 7, 1997, Travers filed in the public record a copy of a letter he had sent to Matthewman on July 29, 1997 in which he demanded that Matthewman take certain actions on his behalf. On October 3, 1997, Travers wrote the undersigned; in this letter Travers made statements such as the following, "Mr. Matthewman, the CJA counsel, is to be commended for his work ethic. He usually shows up on time for visits and allocates a reasonable amount of time for our discussions. The problem is that the visits are not productive and mostly a continuation of the same details and information already discussed previously. The heart of the problem is that he is not qualified or experienced in the areas of law that this case is all about.... It's like someone who comes to work on time, but in the final analysis is unable to do the job he was hired to do. It won't work."

As might have been predicted under the circumstances, on October 7, 1997, Matthewman filed his Motion to Withdraw As Counsel For Defendant Joseph Travers. In the motion, Matthewman described his extensive work on Travers' behalf and then stated that despite his best efforts Travers was insisting upon "... pursuing an objective that he considers repugnant or imprudent...." Travers concurred provided, of course, that the Court appoint his choice of counsel. In a *pro se* filing, he disparaged Matthewman as having "limited capability" and of having made an "initial delusionary analysis."

On October 16, 1997, the District Court convened a hearing on Matthewman's Motion to Withdraw. The Court reminded Travers at the commencement of the hearing that he had been warned that his refusal to cooperate with Matthewman would most likely result in his representing himself in this matter. The Court also heard from Matthewman concerning the extensive work he had undertaken on Travers' behalf through the date of the hearing and the difficulties he was having representing Travers. He described at least one incident

where he had gone to meet with Travers at the Federal Detention Center and had been informed by a BOP employee that Travers refused to meet with him. He also described at least one motion which Travers insisted that he make which he considered to be unethical and other legal positions that Travers wished him to take that he considered imprudent because they were contrary to Travers' best interests.

The Court also heard from Travers. Although Travers went on at length about the quality of representation he had received from his prior counsel, he was unable to dispute, on a factual basis, the extent or quality of work done on his behalf to date by Matthewman. Rather, his complaint was that Matthewman wanted to exhaust pending plea negotiations with the government before filing motions which Travers was unable to identify that allegedly would raise important but unspecified constitutional issues. In other words, as Matthewman explained the difficulties during the hearings, Travers "... advised me that he's gone to law school. He's advised me that he knows better than me."

After giving Travers an opportunity to speak at length concerning his dissatisfaction with Matthewman, the Court endeavored to persuade Travers that he ought to cooperate with CJA counsel by explaining court policy concerning the appointment of CJA counsel, the qualifications and standards which CJA counsel are required to meet in the Southern District of Florida, and the ethical responsibilities of attorney representing indigent defendants, including their obligation to exercise independent professional judgment on behalf of their clients. The Court also made it clear to Travers that she was not persuaded that Matthewman was incompetent or ineffective, that Travers' complaints were baseless and that if Travers persisted he would have to represent himself. In the end, Travers agreed that he would try to work with Matthewman and Matthewman agreed to remain Travers' lawyer so long as Travers cooperated with him. The hearing concluded with the Court reserving ruling on the motion to withdraw with the specific under-

to trial on January 19, 1998 because Matthewman and Almon were still involved in the RICO

trial and thus the case was continued to the two week period beginning February 16, 1998.

standing that Matthewman was the last CJA counsel that the Court intended to appoint in his case. The undersigned stated, "Now you understand, though Mr. Travers, this is the end of the road ... Either you get along with Mr. Matthewman—or you are on your own." Travers responded, "Okay. I know."

The Court did not hear further from Travers concerning Matthewman until January 27, 1998 when Travers launched his most recent and final assaults on Matthewman's representation. These attacks apparently were provoked by Travers' realization that a bond reduction motion which Matthewman had filed in December was not going to result in his being released on a personal surety bond.[17] Thereafter, in numerous filings, including copies of letters from Travers to Matthewman which otherwise would be privileged, Travers relentlessly assailed Matthewman's professional competence and integrity. Then, on February 11, 1998, Travers administered what he clearly intended to be his *coup de grace* to Matthewman's representation: he filed his Omnibus Motion For Counsel to which he attached a copy of a complaint he had filed in Dade County Circuit Court actually suing Matthewman for professional negligence. He also told Matthewman that he had filed a Bar complaint against him.

On February 13, 1998, the Court convened a hearing on Matthewman's Renewed Motion To Withdraw As Counsel. At the hearing, the Court heard from Matthewman, the AUSA handling the case, and Travers. As explained in greater detail below, the Court specifically found that Matthewman had been diligent and had made every good faith effort to effectively represent Travers, but that Travers had frustrated his attempts to do so.

The Court further found that Travers had a full appreciation for what a trial entails and that he knew that the Court likely would not appoint another CJA counsel to represent him in the event that Matthewman was permitted to withdraw. Finally, the Court found that the record of Travers' dealings with his lawyers clearly established that Travers was engaged in a deliberate effort to obstruct, hinder and delay the prosecution of this case, and that Travers would not cooperate with any Court appointed counsel.[18]

## MOTIONS TO WITHDRAW

█ Matthewman's Motion to Withdraw and Renewed Motion To Withdraw allege that Travers insists upon pursuing objectives that Matthewman finds repugnant in that they are intended to delay and prevent the disposition of Travers' case on the merits and are otherwise imprudent, because Travers refuses to cooperate with him, and because Travers has disparaged his professional competence and personal integrity. The Court has considered Matthewman's requests in light of the following factors which have traditionally been applied to withdrawal motions, specifically: 1) the reasons why withdrawal is sought; 2) the prejudice that might result from withdrawal; 3) the harm withdrawal might cause to the administration of justice; and 4) the degree to which withdrawal will cause a delay in the resolution of the case. *See, e.g. United States v. Healthcare Rehab Systems, Inc.*, 1997 WL 834546 (D.N.J.1997); *Becker & Poliakoff v. King*, 642 So.2d 821 (4th Dist.1994); *Preddy, Kutner, Hardy, Rubinoff, Brown & Thompson v. Kleinschmidt*, 498 So.2d 453 (3rd Dist.1981). The Court has also considered that Travers

---

**17.** In late December 1997, Matthewman moved for a bond reduction on Travers' behalf arguing that Travers could now make a $150,000 corporate surety bond and a $150,000 10% bond. The motion was being given serious consideration by the Court when Travers made a *pro se* filing claiming that Matthewman's motion was unauthorized, that the only bond he could make was a personal surety bond and that the court should allow him to be released on that basis without his being burdened by any bothersome electronic monitoring requirements. On February 12, 1998, the Court issued its order denying the bond reduction motion for the reasons stated therein,

including the Defendant's extensive use of aliases and access to false identification documents.

**18.** According to the United States, this is not the first time that Travers has used such dilatory tactics during litigation. At a hearing on February 13, 1998, Assistant United States Attorney Marvelle McIntyre–Hall referred to a 1981 case against Travers in which "the same kind of conduct was exhibited and demonstrated by him as he is doing today before this court.... If he cannot control, if he cannot manipulate, then he has no use for the defense counsel."

urges Matthewman's removal, although Travers contends that Matthewman should be removed because Matthewman has failed to represent him competently and diligently.

As an initial matter, the undersigned rejects Travers' contention that Matthewman's performance has been deficient or ineffective in any respect. When queried and given an opportunity to speak at length at the February 13, 1998 hearing, Travers made his by now familiar complaints that Matthewman had not done what Travers wanted done on Travers' timetable, that Matthewman had failed to obtain his release on a personal surety bond, and that Matthewman had failed to secure the dismissal of the indictment on speedy trial and similar procedural grounds. Matthewman responded that in his independent professional judgment Travers' interests lay in the resolution of the case on the merits, including possibly through plea negotiations, rather in pursuit of the highly improbable objectives upon which Travers had become transfixed. Matthewman further explained that, among other efforts to assist Travers, be had made twenty personal visits and had numerous phone conferences with Travers, that he had conducted an extensive correspondence with Travers and others, and that he had met and spoken on several occasions with Almon, as counsel for Wendy Fong, all to prepare Travers' defense and to coordinate defense strategy. Matthewman further pointed out that he had obtained a court order appointing a forensic accountant to assist in the preparation of Travers' defense with whom he had consulted and that he had interviewed other experts. Matthewman also indicated that he had met on several occasions with the prosecutor for discovery conferences and to discuss a possible plea, that he had secured copies of the discovery, including tapes, and provided it to Travers for his review, that he had obtained a copy of the entire court file and reviewed it page by page with Travers and that he had investigated the case in various ways, including by contacting possible witnesses. The Court has no reason to question Matthewman's candor and credibility, while at this point Travers' credibility concerning the inadequacies of his various lawyers is highly suspect. Thus, accepting Matthewman's de-scription of his efforts to assist Travers as true, Matthewman's performance as Travers' counsel has been satisfactory and appropriate in all respects.

██ Turning next to the reasons why Matthewman seeks permission to withdraw, the Court has taken note that Matthewman relies on the Rules of Professional Conduct of the Rules Regulating the Florida Bar as support for his motions. Specifically, Rule 4–1.16 of the Rules of Professional Conduct of the Rules Regulating the Florida Bar provides in pertinent part:

(b) **When Withdrawal Is Allowed.** Except as stated in subdivision (c), a lawyer may withdraw from representing a client if withdrawal can be accomplished without material adverse effect on the interests of the client, *or if:*

(1) the client persists in a course of action involving the lawyers services that the lawyer reasonably believes is criminal or fraudulent;

(2) the client has used the lawyers services to perpetrate a crime or fraud;

(3) a client insists upon pursuing an objective that the lawyer considers repugnant or imprudent;

 *  *  *  *  *  *

Similarly, Rule 4–6.2 provides in pertinent part:

A lawyer shall not seek to avoid appointment by a tribunal to represent a person except for good cause, such as when:

 *  *  *  *  *  *

(a) representing the client is likely to result in violation of Rules of Professional Conduct of the law;

 *  *  *  *  *  *

(c) the client or the cause is so repugnant to the lawyer as to be likely to impair the client-lawyer relationship or the lawyer's ability to represent the client.

These rules do not require the Court to allow Matthewman to withdraw; they do, however establish that Matthewman ethically may seek to withdraw for the reasons stated in his motions and that the Court in its discre-

tion may grant his request if the reasons are supported by the record.

In fact, the record in this case amply supports Matthewman's position that Travers has deliberately sabotaged Matthewman's representation by insisting upon repugnant or imprudent courses of action within the meaning of Rule 4–1.16 and, ultimately, by refusing his representation altogether. For example, although Travers concurred with Matthewman at the beginning of his representation that speedy trial ought to be waived, he later insisted that Matthewman move for dismissal of the indictment on speedy trial grounds. He remains fixated on his desire to be released on a personal surety bond, even though the Court has made it clear on several occasions that his criminal history, his access to phony identification documents, his chronic use of aliases and his foreign ties make him a flight risk in the absence of a substantial bond. Apparently because Matthewman does not agree with Travers that the indictment is subject to dismissal on either speedy trial or other technical grounds and that a personal surety bond is not a realistic possibility, he has refused to meet with Matthewman on multiple occasions at the Federal Detention Center. He has also refused to participate in the pretrial preparation of his case so long as he remains incarcerated, and, against Matthewman's advice, he has filed numerous of his letters to Matthewman, thereby jeopardizing his attorney-client privilege.

In addition to the foregoing, Travers otherwise has made himself loathsome and repugnant to Matthewman within the meaning of Rule 4–6 .2. He has constantly disparaged Matthewman's professional competence and ethics and his personal integrity in numerous letters which are now in the court file. Most recently, he has sued Matthewman for professional negligence in a wholly frivolous *pro se* complaint that he has filed in the local state court and has advised Matthewman that he has also filed a bar complaint against him.

Based upon the foregoing, the Court's judgment is that the antipathy which Travers has expressed for Matthewman cannot be realistically put aside by Matthewman and renders it impossible for Matthewman to continue to represent Travers on any meaningful basis. As to the other relevant considerations, the Court further finds that Travers will not suffer any prejudice as a *result* of Matthewman's withdrawal if allowed; any prejudice which Travers has suffered in this case by reason of his inability to work with Matthewman and all of his other lawyers (except Xanttopolous) is solely attributable to Travers' conduct. Finally, in the peculiar circumstances of this case, it now seems clear that requiring Matthewman to continue to represent Travers will only serve to delay the case further and encourage Travers to persist in his efforts to prevent the resolution of the case on its merits. Accordingly, Matthewman's Motion To Withdraw and Renewed Motion To Withdraw will be GRANTED.

### *TRAVERS' FORFEITURE OF HIS SIXTH AMENDMENT RIGHT TO COUNSEL*

██ The next issue confronting the Court is whether to appoint new counsel for Travers or whether Travers' has, at this point, forfeited his right, at least, to court-appointed counsel. In considering this important issue, the undersigned is mindful that "[t]he Sixth Amendment to the Constitution guarantees that in all criminal prosecutions, the accused shall enjoy the right to the Assistance of Counsel for his defense." *Wheat v. United States,* 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). This right is deemed essential ". . . to assure fairness in the adversary criminal process . . ." where ". . . an unaided layman . . ." might have great difficulty "arguing the law or in coping with an intricate procedural system." *United States v. Brown,* 79 F.3d 1499, 1504 (7th Cir.1996) quoting *Wheat,* 486 U.S. at 158; *United States v. Morrison,* 449 U.S. 361, 364, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981); *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). However, this Court is also aware that a defendant's Sixth Amendment rights are not absolute. In *Thomas v. Wainwright,* 767 F.2d 738 (11th Cir.1985), the Court held that "an indigent criminal defendant has an absolute right to

be represented by counsel, but he does not have a right to have a particular lawyer represent him, nor demand a different appointed lawyer except for good cause ... which cannot be determined solely according to the subjective standard of what the defendant perceives." Moreover, in *Wheat* the Supreme Court held that the right to be represented by counsel of one's choosing can be limited if necessary to promote the due administration of justice. Thus, in *United States v. McLeod*, the Court of Appeals held that a defendant had forfeited his right to be represented by counsel in connection with a motion for new trial by engaging in abusive conduct toward his attorney. *McLeod*, 53 F.3d 322 (11th Cir.1995) ("under certain circumstances, a defendant who is abusive toward his attorney may forfeit his right to counsel.")

■ The history of this case, as described above, amply demonstrates that this is an extreme case. For some twenty months now Travers has been persistently abusive, threatening and coercive in his dealings with his court appointed counsel, Agnoli and Matthewman, as well as with all of his privately retained counsel except Xanttopolous. Moreover, the record reflects that Travers will not work with any attorney that he does not choose personally and further suggests that Travers is intentionally provoking conflicts with his counsel in order to delay the disposition of this case on the merits. Importantly, the record also demonstrates that Travers has been repeatedly warned that his failure to cooperate with court appointed counsel could result in the Court making a finding that he had forfeited his right to counsel and, particularly with respect to Matthewman, that the Court would so find unless Travers' contumacious conduct ceased.[19]

Finally, the Court finds that Travers is knowledgeable concerning what a trial entails and, in any event, has been orchestrating the pretrial preparation of his defense essentially without the assistance of counsel since he has refused nearly all professional advice.

■ Under these circumstances the undersigned finds that the Defendant Joseph Travers has forfeited his right to court appointed counsel.[20] However, in order to ensure that the Defendant has access to the advice of qualified counsel in the event he should wish to avail himself of it, the Court will appoint the Federal Public Defender as Travers' stand by counsel. In addition, the Court will countenance no further delays in the disposition of this matter beyond those necessary to allow for adequate preparation of the case for trial. Therefore, the Defendant is hereby noticed that the case will proceed to trial during the calendar period set forth below.

Accordingly, it is hereby

ORDERED AND ADJUDGED as follows:

1. The Motion To Withdraw and Renewed Motion To Withdraw As CJA Counsel For Defendant Joseph Travers of William Matthewman, Esq. is GRANTED;

2. The Defendant Joseph Travers has FORFEITED his right to court-appointed counsel;

3. The Federal Public Defender is APPOINTED AS STAND BY COUNSEL for Defendant Joseph Travers;

4. This case is SPECIALLY SET FOR TRIAL during the two week period beginning June 22, 1998 and will not be continued for any reason, including retention of counsel by the Defendant Joseph Travers. In setting this trial date, the Court specifically finds that pursuant to 18 U.S.C. § 3161(h)(1)(F), (h)(7), and (h)(8)(A), the speedy trial time has been continuously tolled in this matter and remains tolled, in the interests of justice, until the commence-

19. At the February 13, 1998 hearing, Mattewman explained Travers' intentions as follows: "He has told me that he has gone to law school and that he knows more than I do.... He has, on several occasions, told me that he will not prepare his case for trial while he is in this mausoleum; the mausoleum being the Federal Detention Center.

He has told me that if the case goes to trial he will not come...."

20. The Court would welcome the retention by Travers of his own counsel so long as it is understood that an appearance by new counsel will not result in a continuance of the trial date.

ment of the trial.[21]  The parties shall appear for the calendar call, and otherwise comply with the Court's separately issued trial order;

5.  The Federal Public Defender or her designee shall appear at all hearings and be available to assist Defendant Joseph Travers as stand by counsel at all such hearings as well as at the trial of this cause;

6.  All pretrial motions in this case must be filed no later than the close of business on April 15, 1998.

---

**21.**  The Court has considered the factors listed in 18 U.S.C. § 3161(h)(8)(B) in making this determination.